THE STATE v. N. B. LEWIS.

*Constitution, Art.* 4, § 11—*Officers de facto.*

1. Upon the death of one of the Judges of the Superior Courts, the Governor has the authority, under Art. 4, § 11 of the Constitution, to require one of the other Judges to hold one or more specified terms of the Courts in the district assigned to the deceased Judge.

2. The proper interpretation of Art. 4, § 11 of the Constitution, is, that while the Governor is taking a reasonable time for deliberation and acquiring information that will aid him in choosing a competent and worthy officer, he may require an unoccupied Judge to hold a specified term or terms of the Courts of the district to which the successor of the deceased Judge will be assigned by the general law immediately upon such successor's qualification.

3. An officer *de facto* is one whose acts, though not those of a lawful officer, the law, upon principles of policy and justice, will hold valid, so far as they involve the interests of the public and third persons, where the duties of the office were exercised (1) without

a known appointment or election, but under such circumstances of reputation or acquiescence as were calculated to induce people, without inquiry, to submit to or invoke his action, supposing him to be the officer he assumed to be; (2) under color of a known and valid appointment or election, but where the officer failed to conform to some precedent requirement or condition, such as taking an oath, giving a bond, or the like; (3) under color of a known election or appointment, void because there was a want of power in the electing or appointing body, or by reason of some defect or irregularity in its exercise, such ineligibility, want of power or defect being unknown to the public; (4) under color of an election or appointment, by or pursuant to a public unconstitutional law, before the same is adjudged to be such.

4. Where the Governor issues a commission to one of the Judges of the Superior Courts, authorizing him to hold certain terms of the Superior Courts, and the Judge undertakes to discharge the duties required of him, he is, so far as the public and third persons are concerned, a *de facto* Judge so long as he assumes to act in that capacity; and this is so although the commission was issued without authority of law.

5. Where the Constitution has clothed the Governor with the power to require a Judge to hold a Court in a district other than that to which he is assigned by the general law, upon certain conditions as to the fulfilment, of which the Governor must of necessity be the judge, and the Governor issues a commission, the Supreme Court will assume that, in fact, the emergency had arisen which would sanction the issuing of the commission, and the same will be recognized as valid if the Governor could, for any reason, have lawfully issued it.

6. It is the duty of the Supreme Court to resolve all doubts in favor of the constitutionality of a statute passed by the Legislature, or of an official act of the chief executive officer of the State.

(DAVIS, J., concurred in the ruling of the Court that a Judge acting under a commission from the Governor is a Judge *de facto*, but dissented from construction placed upon Art. 4, § 11 of the Constitution.)

This was an indictment for assault and battery with a deadly weapon, tried at the July Term, 1890, of the Superior Court of ROCKINGHAM County, before *Whitaker, J.*

The Judge was acting by virtue of the following commission from the Governor:

STATE v. LEWIS.

RALEIGH, July 8th, 1890.

*To Hon. Spier Whitaker*—GREETING:

We, reposing special trust and confidence in your integrity and knowledge, do by these presents appoint you to hold Fall Terms of the Superior Courts of Rockingham County, beginning July 22d, 1890, and Stokes County, beginning August 4th, 1890, in the Ninth Judicial District, in lieu of Hon. William Shipp, deceased, and do hereby confer upon you all the rights, privileges, and powers useful and necessary to the just and proper discharge of the duties of your appointment

In witness whereof, His Excellency Daniel G. Fowle, our Governor and Commander-in-Chief, hath signed with his hand these presents, and caused our Great Seal to be affixed thereto.

Done at our City of Raleigh this 8th day of July, in the year of our Lord one thousand eight hundred and ninety, and in the one hundred and fifteenth year of our American Independence.

DAN'L G. FOWLE, *Governor.*

By the Governor:

WM L. SAUNDERS, *Secretary of State.*

There was a verdict of guilty. Prayer for judgment. Motion in arrest of judgment for that Judge Shipp having recently died, and the office of Superior Court Judge for the Eleventh Judicial District being now vacant by reason of the Governor's failure to appoint his successor, as required by the Constitution and laws of North Carolina to do, there is no one authorized to hold the Court which, in the order of rotation, should have been held by Judge Shipp.

The appointment of Judge Spier Whitaker to hold this regular term of Court is without authority under the Constitution, he being, in the order of rotation of Judges, required to hold the Court of the Second District, Judge Shipp's successor, under sections 11 and 25 of Article 4 of the Constitu-

tion, being the only person required or authorized to hold said term of said Court.

That this case is, therefore, *coram non judice.*

His Honor having found as a fact that Judge Shipp was dead before his special commission to hold this Court was issued, arrested the judgment, and the Solicitor appealed.

*The Attorney General* and *Messrs. R. H. Battle* and *Sam'l F. Mordecai,* for the State.

No counsel *contra.*

AVERY, J.—after stating the case: If Judge Whitaker was acting either *de jure* or *de facto* as Judge of the Superior Court of Rockingham County in opening and organizing that Court, and in presiding at the trial of the defendant until the jury returned a verdict of guilty, it was error to allow the motion of the defendant and enter the order arresting the judgment  Were we to concede not only that the Governor did not have the power, under the Constitution, to appoint him and clothe him with the rightful authority, but that his acts as a *de facto* officer also ceased to be valid and binding as to the public and third persons, when he declared in open Court his purpose to abdicate because he was of opinion that the said term could not have been lawfully held except by a successor regularly appointed and commissioned by the Governor to fill the vacancy caused by the death of Judge Shipp, still his refusal to proceed further with the business of the Court would not affect the validity of any previous act done under color of his appointment from the Governor, and when he was holding himself out to the public as the rightful incumbent by virtue of the special commission entered of record.  Judge Whitaker was a *de facto* officer so long as he continued to preside and to assert his power under, and by virtue of, the commission issued by the Governor, even if we concede, for

STATE *v.* LEWIS.

the sake of the argument, that he was not the rightfully constituted Judge of the Superior Court of Rockingham County, and that his power as a *de facto* officer continued only so long as he exercised it

Chief Justice BUTLER, in the case of *State* v. *Carroll*, 38 Conn., 449, after a very exhaustive examination and review of the English and American authorities, defines and classifies officers *de facto* as follows: "An officer *de facto* is one whose acts, though not those of a lawful officer, the law, upon principles of policy and justice, will hold valid, so far as they involve the interests of the public and third persons, where the duties of the office were exercised (1) without a known appointment or election, but under such circumstances of reputation or acquiescence as were calculated to induce people, without inquiry, to submit to or invoke his action, supposing him to be the officer he assumed to be; (2) under color of a known and valid appointment or election, but where the officer failed to conform to some precedent requirement or condition, as to take an oath, give a bond, or the like; (3) under color of a known election or appointment, void because there was a want of power in the electing or appointing body, or by reason of some defect or irregularity in its exercise, such ineligibility, want of power or defect being unknown to the public; (4) under color of an election or appointment by or pursuant to a public unconstitutional law before the same is adjudged to be such."

If it be admitted that the Governor was not empowered by Art. 4, § 11 of the Constitution, to require Judge Whitaker to hold the term of Rockingham Court, which Judge Shipp, before his death, had been assigned to hold, still, when the commission was issued, even without authority, and the appointee undertook to discharge the duties required of him, he was, in so far as it affected the public and the rights of third persons, *de facto* Judge of the Court, so long as he assumed to act in that capacity belonging to the third class mentioned in the opinion of Chief Justice BUTLER.

The defendant, finding the Judge holding the Court by authority of a commission from the Governor requiring him to discharge that duty, without objection, if he had ground for raising any, pleaded "not guilty" to the charge of assault and battery, and, after a trial, in which no exceptions were entered to the rulings of the Court, the jury returned a verdict of "guilty." Up to this point, his Honor was assuming his judicial functions, and it is not material if his real purpose was to make a case on appeal for this Court, in which the validity of his official acts as Judge of that Court would be brought in question, because, so long as he proceeded in the transaction of the business of the term, he was Judge *de facto* of the Superior Court of Rockingham County, and his acts were as valid and conclusive on the defendant Lewis as though he had claimed himself, and been admitted by all others, to be the Judge *de jure* of that Court. If the defendant should be again put upon trial for the same offence, there can be no question that the record of this trial, including a copy of Judge Whitaker's commission, would sustain a plea of former conviction.

After the Judge had determined that he was not empowered to hold the Court by virtue of the commission, he ordered, on motion, that the judgment be arrested. If, by his own volition, he ceased to be a *de facto* officer after the verdict was entered, then he had no authority to arrest the judgment. If he was still a *de facto* officer, there was no sufficient reason why the judgment of the Court should not have been pronounced, as it must hereafter be entered, on motion of the Solicitor.

The principles we have stated, as embodied in the opinion in *State* v. *Carroll, supra,* are sustained by the decisions of this Court, as well as the Courts of other States. *Burke* v. *Elliott,* 4 Ired., 355; *Gilliam* v. *Reddick, ibid.,* 368; *Norfleet* v. *Staton,* 73 N. C., 546; *State* v. *Edens,* 95 N. C., 693; *State* v. *Speaks,* 95 N. C., 689; *Attorney General* v. *Crocker,* 138 Mass.,

214; *Petersbed* v. *Stone*, 119 Mass., 465; *State* v. *Carroll, supra*, and authorities cited; *Diggs* v. *State*, 49 Ala., 311; *Venable* v. *Curd*, 2 Heard., 582; *Conover* v. *Devlin*, 15 How. Pr. Rep., 470; *State* v. *Williams*, 5 Wis., 308; *Woodruff* v. *McHenry*, 56 Ill., 218. The views which we have thus far presented have the approval of all of the members of the Court.

A majority of the Court concur in resting our ruling upon two additional grounds—

1. That there is nothing in the record which, in legal contemplation, excludes the possibility that the Governor appointed the Judge to hold two special terms—one in Rockingham and the other in Stokes County; and if he did not have the power to require the Judge assigned to a different district to hold "specified regular terms," under the provisions of section 11, Art. 4, it will, nevertheless, be presumed that he was exercising his rightful authority in ordering the the holding of special terms.

2. That the Governor did not, in fact, transcend his authority if he issued the commission—not because it appeared to him that special terms were necessary in the counties named therein, but under the idea that he was empowered to require the Judge appointed to hold "specified" regular terms on account of the death of the Judge assigned to the Ninth Judicial District, and while he had under consideration the selection of his successor.

Section 11, Art. 4 of the Constitution, is as follows: "Every Judge of the Superior Court shall reside in the district for which he is elected. The Judges shall preside in the Courts of the different districts successively, but no Judge shall hold the Courts in the same district oftener than once in four years; *but, in case of protracted illness of the Judge assigned to preside, or any other unavoidable accident to him*, by reason of which he shall be unable to preside, the Governor may *require any Judge to hold one or more specified terms* in said

district in lieu of the Judge assigned to hold the Courts of the said district."

Section 913 of *The Code* is as follows: "The Governor shall have power to appoint *any Judge* to *hold special terms* of the Superior Court in any county, and, by consent of the Governor, the Judges may exchange the Courts of a particular county or counties; but no Judge shall be assigned to hold the Courts of any district oftener than once in four years, and whenever a Judge shall die or resign, his successor shall hold the Courts of the district allotted to his predecessor."

Section 11, Art. 4 of the Constitution, in its bearing upon the statute in reference to special terms, has been more than once construed by this Court, and it is now well settled that the Governor, under its express provisions, has the the power to require a Judge to hold one or more special terms in different districts from that to which he has been assigned in the regular course of rotation. *State* v. *Speaks*, 95 N. C., 689.

In the case of *State* v *Watson*, 75 N. C., 136, Justice ROD-MAN, for the Court, says: "The reason assigned by the Governor in the commission, stated to be that two Judges had agreed to a partial exchange of districts, does not, in our opinion, avoid the commission    The *Governor is not bound to assign* any reason *in the commission, or to this Court.* As to all the world, except the *Legislature, he is the final judge of the fitness of his reasons.* It may be that he desired to accommodate the Judges, and no public inconvenience occurred to him as probable. If so, we cannot say that the reason was insufficient, and that, being insufficient, it avoided the commission.    In doing so, we would clearly encroach on the executive duty and responsibility."

It is the duty of this Court to resolve all doubts in favor of the constitutionality of a statute passed by the Legislature, or of an official act of the chief executive officer of the State. As the Court say in *State* v. *Watson, supra,* the Governor was not bound to assign a reason, nor must we,

because a reason has been embodied in the commission, conclude that the Governor had no other sufficient grounds for requiring Judge Whitaker to hold the Court. It may be, for aught that appears to the contrary in the record proper, that the Governor acted on a certificate framed under the provisions of *The Code,* § 914, and sufficient to warrant his calling a special term at the time when the regular terms were ordinarily held. He had the power to do so, and might issue the order direct to the Judge. Neither the certificate forwarded to the executive office nor the notice sent down to the County Commissioners (*The Code,* § 915) constitute an essential part of the record of the term. This Court is not bound to conclude that Courts were not special terms because they are called "fall terms" in the commission, nor because they were held at the time appointed by law for holding the regular fall sessions. Judge Shipp being dead, the Governor had the power to call special terms of the Courts, both in Rockingham and Stokes counties. We should always assume that he did not, in fact, exceed the limit of his powers under the Constitution when, consistently with every fact disclosed, it may be that his acts were valid. If it be granted that the successor of Judge Shipp, had he been appointed and inducted into office, would have been the proper officer to hold the regular term of the Court in Rockingham at the precise time when Judge Whitaker presided there, this Court is not at liberty to jump to the conclusion that some delay in filling a vacancy is not allowed, in order that the Governor, when he thinks the public interests will be best subserved by doing so, may take time to consider and inquire as to the fitness of persons whose names are suggested for a position so important and responsible. Where the appointment is tendered and declined, or if, for any other reason, there is delay, while the Chief Executive is instituting inquiry for the purpose of selecting a suitable person to fill the office, he is not prohibited from requiring

a Judge, who is not engaged in holding the Courts of another District, to hold one or more terms in that to which there is no Judge assigned. If the Governor should purposely and unreasonably postpone the exercise of the appointing power, for that, like any other misfeasance in office, the Legislature may call him to account.

Since section 11, Art. 4 of the Constitution, as amended in 1875, was construed in *State* v. *Monroe,* 80 N. C., 373, to prohibit only the holding by any Judge twice in four years of the whole series of Courts comprehended in one district, and that case has since been approved in *State* v. *Speaks,* 95 N. C., 689, it is too late to contend that the constitutional convention intended to put an end to all exchanges, or the holding of the Courts in the same county oftener than once in four years, with only the two exceptions—where the Judge assigned is disabled by protracted illness or some accidental injury. Courts have been held in all portions of the State by Judges acting under commissions from the Governor, and we are not disposed to entertain a proposition to overrule adjudications so often acted upon by the Chief Executive officer of the State.

In section 25, Art. 4, of the Constitution we find the provision that "if any person elected or appointed to any of said offices shall neglect and fail to qualify, such office shall be appointed to, held and filled as provided in case of vacancies occurring therein," viz., by the Governor. Suppose the Governor should appoint one to fill such a vacancy, and the appointee should accept, but fail to qualify immediately, would the Governor have the right, and would it be his duty, without regard to circumstances, to make a second appointment without delay, because there was some official work awaiting the qualification of the new appointee? Would the Courts be justified in declaring the acts of the old incumbent void because the Governor's first appointee in lieu of the person elected and declining neglected to

qualify, and the Governor had unreasonably postponed making a second appointment?

Where the Constitution has clothed the Governor with the power to require a Judge to hold a Court in a district different from that to which he is by general law assigned, upon certain conditions, as to the fulfillment of which he must, of necessity, be the judge, when he issues the commission this Court will assume if he could, for any reason, lawfully require such service of a Judge, that, in fact, the emergency had arisen that called for the exercise of the authority given him by law. *State* v. *Watson, supra.* Constitutional, as well as statutory, provisions, made in pursuance of the organic law, are often so framed that the Governor is left to determine in his discretion whether the contingency, on the happening of which he is to exercise a certain power, has arisen. Cooley's Const. Lim., marg. pp. 41 and 187; *Kendall* v. *Inhabitants of Kingston,* 5 Mass., 533. And in such instances there is no power lodged elsewhere to correct a mistake of judgment on his part. The Legislature can notice a wilful abuse of authority. It is provided in section 914 of *The Code* that the Governor may order a special term of the Superior Court to be held in a county, whenever it shall appear to him "by the certificate of any Judge, a majority of the Board of County Commissioners, or otherwise," that a certain state of facts exists. He is the sole judge of the sufficiency of the evidence to satisfy him that the business of a Court is such as to require the holding of a special term. The Legislature could not require the Governor to exercise his power of appointment within a given period, and, therefore, the statute must be understood (in a qualified sense growing out of this limit to their authority) as meaning that the successor, *when appointed,* "shall hold the Courts of the district allotted to his predecessor" that shall not have been previously held.

107—62

But looking exclusively to the phraseology of section 11, Art. 4, we think that we are warranted in resting our ruling upon the ground that the Constitution, by its express terms, empowered the Governor to appoint Judge Whitaker to hold the two "specified terms," in lieu of the Judge assigned to the district, because he had not, for want of sufficient time to select among eligible lawyers, or for other good reason, designated the successor to Judge Shipp, who had died after being assigned by law to the Ninth Judicial District. The word "accident," in its legal sense, has been defined to be "(1) an event happening without the concurrence of the will of the person by whose agency it was caused; (2) an event that takes place without one's foresight or expectation." The death of Judge Shipp, of course, is due to divine agency, and, therefore, the first of the two definitions could not be adopted upon our theory in this case, but, on the other hand, the additional qualifying and intensifying word "unavoidable" would imply not simply the passive state of having no agency in bringing about the event, but the active exertion of one's powers to prevent it. Death is an event that takes place without the "foresight or expectation" of its victim, as well as in spite of the natural resistance of his vital powers and energies, and is an "unavoidable accident," happening not only without the concurrence of the will of the man, but because, by summoning all of his will power, he cannot prevent it. Webster says that the word "accident" is often used in the sense of "an undesigned and unfortunate occurrence of an afflictive nature; a casualty; a mishap, as to die by accident." The same author defines "unavoidable" as meaning "incapable of being shunned or prevented; inevitable." Combining the synonyms of the two words, it seems that we might say with propriety and accuracy that Judge Shipp, though dead, had, on account of an "inevitable mishap, or an occurrence to him of an afflictive nature" that could not have been "prevented," been unable to preside.

If, using the word "accident" in the sense of chance, we hold that the framers of our organic law meant to provide only for the contingency of the Judge being disabled by some unforeseen injury to him, can we give effect to the adjective "unavoidable" by looking into the facts attending his mishap, and declaring judicially that it could not have been shunned by any degree of care on his part, and that any occurrence to him, except death, was utterly inevitable, had he exerted all of his power to obviate it. Anderson, in his Law Dictionary, p. 12, says: "An accidènt is an event or occurrence which happens unexpectedly from the uncontrolable operations of nature alone, and without human agency," and that unavoidable accidents are "such as are inevitable" or absolutely unavoidable because effected or influenced by the uncontrolable operations of nature." *Ibid.*, p. 13. The same author gives also another definition as follows: "An accident not occasioned in any degree remotely or directly by want of such care or skill as the law holds every man bound to exercise." But, from the nature of the case, the framers of the Constitution could not have intended to make their meaning dependent upon the decision of a question of negligence, and must have used the words in the other sense in which they are defined by the authors. This interpretation brings this section into harmony with section 25, Art. 4, where it is provided that until a newly elected officer, or one appointed in place of a newly elected officer failing to qualify, shall comply with the conditions precedent to his lawful induction into office, the incumbent shall hold over. In that event, the duties are discharged by the person whose regular time has expired, even while the Governor is searching for a suitable person to appoint in lieu of another chosen to succeed him. In our case, we interpret the Constitution to mean that while the chief executive officer is taking a reasonable time for deliberation, and acquiring information that will aid him in choosing a competent and

worthy officer, he may require an unoccupied Judge to hold a specified term or terms of the Courts of the district to which his appointee will be assigned by the general law immediately on his qualification. If we have fairly construed the language of the framers of the Constitution, the consequences of giving the section a proper interpretation are to be considered by those entrusted with making statute law and suggesting alterations in the organic law. But we see no ground for apprehending that a Governor will ever abuse his power by such unreasonable delay as to impose upon eleven Judges the duties and labor of twelve. Such an unreasonable dereliction in the discharge of a duty imposed by the Constitution as would appear palpably to be a wilful abuse of his power would make him amenable before the General Assembly, the highest of all criminal tribunals in the State.

The order arresting judgment in this case is reversed, and the Court below will proceed to enter such judgment as it may deem proper, if the Solicitor shall pray the judgment of the Court.

DAVIS, J. (concurring in the conclusion reached by the Court, but dissenting upon other grounds): Judge Whitaker was a *de jure* Judge, and his acts while holding, *de facto*, a regular term of Rockingham Superior Court, which was, by law, to have been held by Judge Shipp, or by his successor in the event of a vacancy, were valid, and this is sufficient to decide the question before us. But I do not concur in the opinion that the Governor had the power to require him to hold that Court, under Art. 4, § 11 of the Constitution, or to appoint him to hold it, under section 913 of *The Code,* and I will content myself with a brief statement of my opinion, without elaboration.

I think Art 4, § 11 of the Constitution, as amended by the Convention of 1875, means to provide for the inability of a

living Judge regularly assigned in order of rotation to preside in any district, to do so because of his protracted illness, "or any other unavoidable accident to him, by reason of which he shall.be unable to preside," in which event "the Governor may require any Judge to hold one or more specified terms in said district in lieu of the Judge assigned to hold the Courts of said district"; and I do not think that, by any fair and unstrained implication, it can be made to apply to a vacancy, for that is provided for in clear, express and unmistakable language in section 25 of the same article, and section 11 provides only for Courts to be held in lieu of the disabled living Judge, who, as soon as his disabilities shall be removed, will return to hold his Courts, and not in lieu of his successor who fills the vacancy caused by his death, resignation or otherwise, unless he also shall be under some temporary disability. Under section 913 of *The Code*, the Governor has power to "appoint any Judge to hold a special term of the Superior Court in any county," and to consent to the exchange of Courts by Judges, but he has no power to appoint a special term of the Court except as provided, and only as provided, by sections 914 and 915 of *The Code*, for it will be observed that the constitutional provision (Art. 4, § 14 of the Constitution of 1868), as it existed when *State* v. *Watson*, 75 N. C., 136, was decided, authorized the Governor, "for good reasons, which he shall report to the Legislature at its current or next session, to require any Judge to hold one or more specified terms of said Courts in lieu of the Judge in whose district they are." This provision does not appear in the amended Constitution. I am not aware of any construction that has been placed upon Art. 4, § 11 of the present Constitution, or upon section 913 of *The Code*, by this Court, that will confer upon the executive power to appoint or require a Judge to hold a regular term of the Court in a vacant judicial district.

*State* v. *Watson*, 75 N. C., 136, does not construe either, but is based upon, and is a construction of, Art. 4, § 14 of the Constitution of 1868, which, by express language, conferred upon the Governor, for "good reasons, which he shall report to the Legislature," etc., power to require a Judge "to hold one or more specified terms in lieu of the Judge in whose district they are." And that case does not do more than declare that the Governor, under that section of Art. 4 of the Constitution of 1868, "is the final judge of the fitness of his reasons," as to all the world except the Legislature, to which he is required to report them.

There is no such provision in the present Constitution or laws, and it is no authority in construing the provisions now being considered.

*State* v. *Monroe*, 80 N. C , 373, so far as it relates to Art. 4, § 11, only asserts that it does not restrict the Legislature from creating an extra term of the Superior Court of any county and designating the presiding Judge to hold the same; and *State* v. *Speaks*, 95 N. C., 689, so far as this question is concerned, only asserts that the acts of an officer *de facto* are as binding as if he were an officer *de jure*, and in that all concur.

It is not contended by me that the amended Constitution intended to put an end to all exchanges, or that the Legislature has not the power to provide, within the limits of the Constitution, for the creation of additional or special Courts, inferior to the Supreme Court, and to provide for the manner in which they may be held, but I do not think that the Courts which Judge Whitaker was required to hold were special terms or additional Courts provided for by any law. This Court is bound to take judicial notice of the times and places at which the regular terms of the Superior Courts are held, and we are bound to know, judically, that it was the regular Fall Term, and not a special term, of Rockingham Court that Judge Whitaker was required to hold.

We are charged with the knowledge that the Governor had no power to appoint a special term of Rockingham Superior Court, except as provided for in sections 914 and 915 of *The Code*, and there is no evidence to warrant the assumption or presumption that the Governor was acting under those sections: So far from it, it appears from the record, and is found as a fact, that it was a regular term which was to have been held by Judge Shipp.

I do not think that the Governor is the sole judge of the sufficiency of the evidence to satisfy him that the business of the Court is such as to require the holding of a special term, and even if we could presume, without any evidence and against the record and knowledge with which the Court is charged, that Judge Whitaker was required to hold a special term of Rockingham Superior Court, the Governor had no power to appoint such a Court to be held at the same time as the regular term; and if it appeared, at any time other than a regular term, by the certificate of any Judge, a majority of the Board of County Commissioners, or otherwise, that the business of the county required it, the duty of the Governor is imperative, whatever may be his opinion as to the necessity of the special term, to order it. The language of the statute is "*shall,*" and his executive duty is to obey.

But it is said that the death of Judge Shipp was an *accident,* within the meaning of Art. 4, § 11 of the Constitution. I cannot concur in this view. It would never occur to me to say that Judge Shipp was "unable to preside" at Rockingham Court by reason of the *accident* of his death. Death would put no *accidental* suspension to his ability to hold the Court, but it would create a *vacancy,* and no one could hold it in *lieu of him* until the vacancy was filled, for there was no one in existence in *lieu* of whom it could be held. One may fill a *vacancy* created by the death or resignation of another, but can it be said that he is acting in lieu of the

dead man ? His power to act ended with his life, and when that ended, his place was vacant, and, until filled, there was no one to act, or for whom another could act.

So much of the opinion as is based upon the supposed necessity that might otherwise be imposed upon the Governor to act hastily is an argument *ab inconvenienti*, the force of which is, I think, greatly lessened, if not rendered nugatory, by the provisions of sections 914 and 915 of *The Code*, under which special terms, if any necessity or emergency may exist, may be appointed in the manner plainly prescribed by law, without the exercise of any doubtful or uncertain power which may not exist.

Concurring in the conclusion arrived at, and regretting that I cannot concur in the entire opinion of the majority of the Court, which, however harmless it may be at the present time, may, I fear, in the future, become a dangerous precedent in the hands of an unwise or unconscientious executive, I feel constrained to enter my dissent to so much of the opinion as holds that the Governor had the rightful power to require Judge Whitaker to hold the regular Fall Term of Rockingham Superior Court, made vacant by the lamented death of Judge Shipp, who, in the order of rotation, would have been the proper Judge to preside.

SHEPHERD, J. (concurring): I concur in the decision upon the grounds first stated in the opinion of the Court. As the other questions are of much importance, and, to my mind, not free from difficulty, and as their consideration is unnecessary to the disposition of this appeal, I do not desire to be understood as agreeing to all that has been said in reference to them.

*Per Curiam.*                                                    Reversed.